Mr. Justice CLIFFORD
dissenting.
I concur in the opinion that the true division-line between the rancho of Justo Larios and that of José Reyes Berreyesa is a straight line, and consequently that the decree in question should be reversed, but I dissent altogether from the directions given to the court below and from the reasons assigned in support of those directions. Some brief reference to the. title-papers and to the facts and circumstances of the case is indispensable in order to a clear understanding of the nature of the controversy and of the grounds of my dissent from the views expressed in the opinion pronounced in behalf of a majority of the court.
I. Appellant, in his original petition to the commissioners appointed under the act of the 3d of March, 1851, prayed for the confirmation of his title to an undivided interest of three-fourths in a certain tract of land lying in the County of Santa Clara,- in the State of California, and known as the Cañada de los Capitancillos, which, as lie alleged, was contained within certain natural boundaries. .When he presented the petition, he filed with it copies of the expediente and of. the original grant under which he claimed, and his representation was that he held the title to the tract through certain mesne conveyances therein mentioned and described. Referring to- the expediente, it will be seen that it consists of the petition of Justo Larios, the original donee of the tract, addressed to the Governor, together with the diseño and the usual marginal decree and the concession or vista la petición' and the titulo or original grant. Provisional grant of the land it seems had been made at some early period by the Ayuntamiento of the- Pueblo- of San José Guadalupe to one Leandro Galindo, who built a house on the premises and lived there for many years prior to the grant of Justo Larios,. or to any application by him for the same. House of the occupant was north of the highway and pretty close to the southern base of the Pueblo Hills. Ori *721 ginal claimant, Justo Larios, in bis petition to the Governor, coated at Monterey, on the sixteenth day of June, 1842, represented that he had purchased from the owner of the house all the right he had to the land by virtue of that provisional concession. Such provisional concessions, it is known, were often made, and that it frequently became necessary for a subsequent applicant for a grant of the same tract to purchase the improvements made by the occupant as a means of facilitating his own application. Petitioner describes the tract as a place known by the name of the Cañada de los. Capitancillos, and states that the limits of said tract are from the. boundaries of Santa Clara to the corral, called the corral of the deceased Macarlo. Decree of concession recites that Justo Larios is the owner in full property of a part of the land called Cañada de los Capitaneil-los, bounded by the Sierra, by the Arroyo Seco, on the side of Santa Clara, and by the rancho of the citizen Josh Reyes Berreyesa, which has for boundary a line commencing at the angle formed by the junction of the Arroyo Seco-and the Arroyo de los Alamitos, thence southward to the Sierra, passing the eastern ba.se of the small hill situated in the centre of the cañada.
II. Attention to the description given of the cañada, as contained in the concession, will show, especially when it is taken in connection with the language of the petition, that all of the boundaries of that part not previously granted are either expressly given, or so clearly indicated, as to amount to the same thing, and to leave no room for doubt as to the intention of the' granting power. All will agree, I suppose, that the course of the Arroyo Seco, on the side of the church property called Santa Clara, was well known. Properties of that description were usually well defined, and there is not the slightest pretence of evidence in the case to show that this line was ever in dispute. West line' Of the tract is, therefore, fixed .beyond peradventure. East line of it, as agreed on all sides, is the west line of the rancho of José Reyes Berreyesa. Controversy arose at one time between the original proprietors of those ranchos as to that division-line; *722 but it was duly settled by competent authority. 'king need be added upon that subject, as I agree that me line should be a straight one, as assumed in the opinion of the court; but I insist that it commences at the angle formed by the junction of the Arroyo Seco and the Arroyo de los Ala-mitos, and runs south to the Sierra, wherever that..may be. Beginning is at the -angle formed by the junction of those two Arroyos, and that angle, as all must agree, is north of the house built by Leandro Galindo, and close to the base of the Pueblo Hills, on the northern side- of the cañada. Larios purchased that house and the adjacent improvements, and was living in the house when he presented his petition to the Governor, and when the grant was made. He asked for the valley, alleging that he had occupied it “since the year'1836and it was part of the valley which was granted to him, as will presently more fully appear. Rancho of José Reyes Berreyesa lies east of this tract, and of course the west line of that rancho is the east line of the claim under consideration. Grant to José Reyes Berreyesa is the elder grant, and as the tract in question is bounded on that rancho, it is both proper and necessary to refer to the title-'papers in that case, and to look at the actual location of that grant upon the land, to aid jn the solution of the present controversy. Grantee, in that case, became possessed of a part of the same cañada or valley, in the year 1834, under a grant from Governor Figueroa, and he continued to occupy it with his family until 1842, and perhaps later. During that year he complained to the Governor, thatliis neighbor, Justo Larios, had disturbed his possessions, and prayed that there might be granted to him- two 'sitios of the valley, extending from the' house of Justo Larios to the matadero or slaughterhouse, erected-by him at the easterly end of the valley, “with all the hills that belong to the-cañada.”" Commissioners confirmed his claim for one league,-and on appeal the deci’ee was confirmed by the District Court. Appeal was thereupon taken to this court, and this court held that the concession-' and titulo described a parcel of land included within natural boundaries, but that the conditions of the grant con *723 fined it to a single league in quantity, and affirmed the decree of the District Court, ordering “ the land to be located according to the description, and within the boundaries set out in the original grant, and delineated on the map contained in the expediente.”*
III. All, or nearly all, the improvements made by the claimant in that casé also were north of the camino or highway, and close to the Pueblo Hills on the northern side of-the valley. He built two houses, and they were and are both situated nearly as far north as the angle formed by the junction of the before-mentioned arroyos. Northern boundary of the cañada, therefore, wa3 evidently understood by the grantees of both these ranchos to be, what it is in truth and' faith, the •southern base of the Pueblo Hills. Southern boundary of the cañada is described as the Sierra, and much effort is expended in the attempt to prove that by the word Sierra is meant the Sierra Azul, or the main Sierra. Be that as it may, still, in my view of the case, the opinion of the court is clearly founded in error.
But I deny that the cañada, or valley,, as described in the title-papers, and as understood either by the respective petitioners, or by the granting power, extended southwardly beyond what arc called the Lomas Bajas, or low hills. Those hills, or certain portions of them, are seventeen hundred feet above the level of the Bay of San Francisco, and might well have been regarded by the petitioners and the Governor as the northern base of the main Sierra. Evidence shows that there is no table-land between those hills and the main Sierra, which is called the Sierra Azul, and that they are only separated from the higher range by a narrow, broken, irregular gorge, which forms the bed of the Arroyo de los Capitancillos, through which tumble the waters of that stream on their way from their source in the highlands to the southern skirt of the valley below, which takes its name from the name of the arroyo by which it is watered. Party then interested asked for the sobrante of the cañada lying *724 between the Arroyo Seco, on the side of Santa Clara, and - the rancho of José Reyes Berreyesa; but the Governor refused to make the grant in tnat form, but limited it to one sitio de ganada mayor, or to one league of a larger size.
IV. Application was for the sobrante of the cañada; but if the quantity of the table-land was insufficient to meet the requirement of the grant, then there would be some show of reason for giving the document a more liberal interpretation,- so as to include within the boundaries the quantity granted. No such difficulty, however, arises in the case, because, in' any view taken of the subject, the quantity in-, eluded within the out-boundaries is moré than double the quantity to which the claimant is entitled.
Stripped of all side issues, therefore, the only question is, whether the grant which was for the lands of the valley shall be located there or upon the mountain, which is the southern boundary of the valley where the land lies for which the petitioner asked when he made his application to the Governor.
V. Suppose it were otherwise, and that the main Sierra, or Sierra Azul, is really the southern boundary of the valley, still I maintain that the directions given to the court below to enter a decree confirming the survey of the twentieth of December, 1860; are plainly and clearly erroneous. Operation of those directions, when they are carried into effect, will be to locate the principal portion of the claim upon the Lomas Bajas, and to exclude all the table lands except the narrow strip called in the opinion of the court a tongue,, which is more than a mile in length, and only from twenty to thirty rods in width, and borders on the west line of the adjacent rancho. , Survey apparently was commenced at the main Sierra on the line of the_ rancho of Josh Reyes Ber-reyesa, and runs northwardly oh that line entirely across the valley to the angle formed by the junction of the Arroyo Seco and the Arroyo de los Alamitos, whereas it should have been commenced at the.angle formed by those two arroyos, and run south for quantity, so as to have included the valley for which the petitioner^ asked, when he applied to the Go *725 vernor for the grant. Having determined to commence south and run north for quantity, it became necessary to make that nai’row strip or tongue, else one of two things would follow which must be avoided. Either the tráct would not include the house of the claimant, or it would exceed the quantity of one league if it included the quicksilver mine. Apparently it was a sine qua non that it should include the mine, and it was doubtless thought desirable that it should also include the house of the claimant, because it must have been known that the-usages and customs of the country required it in the location of such grants.
Besides the recital of the concession is, that the rancho of J osé Reyes Berreyesa has for boundary a line commencing at the angle of the two arroyos before mentioned, and it may be that it was thought proper to have some regard to that recital. But it would not do to take more than a narrow strip of the valley, because if more was taken, either the mine must be excluded or the quantity would be too great, and hence all the residue of the table lands must be excluded. Boundaries in the grant are the same as those given in the concession, and consequently are subject to the same observations. Second condition of the grant is, that the donee shall solicit the proper judge to give him juridical possession in virtue of the decree, by whom the boundaries shall be measured out; and he .shall put on the boundaries, in addition to the landmarks, some fruit trees or useful forest trees. Third condition describes the land as one league of the larger size, and the requirement is that the.judge who shall give the possession shall have the' land measured in conformity to law, leaving the surplus which remained to the nation. Land commissioners confirmed the claim for one league, but on appeal taken by the claimant to the District Court that decree was reversed, and a decree entered confirming the claim as one for the whole tract with specific boundaries. Whereupon an appeal was taken to this court, and this - court reversed that decree, and decided that the claim was for one league of land, to be taken within the southern, western, and eastern boundaries designated therein, *726 and which was to be located at the election of the grantee or his assigns, under the restrictions established for the location and survey of private land claims in California, by the Executive department of the Government. Plainly this court then decided that the grant in this case was not one by specific boundaries, but was a grant by quantity, to wit, for one league of land. And the court go on to say that the external boundaries designated in the grant may be declared by the District Court from the evidence on file, and from such other evidence as may be produced before it, and the claim, of an interest equal to three-fourths of the land granted is confirmed to the appellee. Nothing can be plainer, I think, than the fact that it was the out-boundaries of the cañada that this court authorized the District Court to declare. Decree of the District Court then under revision declared the grant to be one of specific boundaries, and assumed to fix them, but this court reversed that decree and declared that the grant was not one of specific boundaries, but a grant for one league of land, and expressly declared that it was to be-taken within the three boundaries named,-and was to be located at the election of the grantee or his assigns, under the restrictions established for the location and survey of private land claims in California, by the Executive department of the Government.*
VI. "Where there are no guides in the title-papers, and the claimant has made no improvement, nor done any act, as by sale of a part, or otherwise, to influence the decision as to the location, the regulations of the Executive department, as a general rule, allow the claimant an election as to the location within the external or out-boundaries of the tract or place described within the grant, subject to the qualification that he must take the land in. a compact form, and as far as practicable, leave the residue in the same condition. But where the title-papers furnish a guide, or where he has built a house, or made other improvements on the claim, or where he has sold a part of his claim, very different rules *727 prevail. Locations under such circumstances are made to conform as near as may be to the intent' of the granting power as indicated in the title-papers; always, however, subject' to the qualification that it must include the improvements of the Claimant, and, .as far as is consistent with the public interest, be made to conform to the parts conveyed, so that the. location may be in one body, and leave the public lands in the same condition. Reference undoubtedly was made by the court to these rules, when it is said that the location must be made under the restrictions established by the Executive department of the Government. - 'These sugs gestions are sufficient, I think, to demonstrate beyond cavil, that the boundaries mentioned in the opinion of the court in that case, were the external boundaries, and that it was those boundaries which were to be fixed by the District Court, and not the specific boundaries of the claim, else there would have been nothing to which the restrictions established by the Executive department of the Government could be applied. Taking this view of the opinion in that case, it is clear and consistent, and if it had been followed the . case would have, been free from all embarrassment. Grant of claimant was declared to be a grant by quantity, to be located within certain out-boundaries, three of which were already ascertained, and it was left to the District Court to ascertain the fourth from the evidence on-file, and such other evidence as might be taken • by the parties, but the survey and location were to be made under the rules and regulations of the land department. Mandate of this-court was that the decree of the District Court should be reversed,- and that the cause be remanded with directions to enter a decree in the case in conformity to the opinion of this court; Opinion of this court was, as before stated, that an interest equal to three-fourths of the land granted should be confirmed to the claimant, and that the District Court should ascertain the northern boundary of the cañada, and when that was done, that the land department should make the survey and location. Cause was remanded; but the District Court, instead ol following the mandate of this court, on the *728 eighteenth of October, 1858, entered a decree defining the-specific boundaries of the claim.
VII. Appeal was taken to this court by the United States, but this court dismissed the appeal, holding that it was improvidently taken, and remanded the case for further proceedings to be had therein, in conformity to the opinion of this court. Decision in effect was that this court had no jurisdiction of the case, and hence the opinion of the court upon any matter connected with the merits of the controversy can hardly be regarded as authority; but it is not necessary to decide that point, as the court, in express terms,, reaffirm what had been decided in the first case. Both decisions of this court in this case, therefore, show that the grant is one by quantity, to be located within the boundaries of the cañada, and I entertain no manner of doubt that such is the true construction of the grant. Such a claim should be surveyed and located under the rules and regulations of the Executive department, whether it be made by the Land Office or-by the courts. Location as decided in the opinion of the court in this case will be in violation of every one of those rules and regulations, and will also be diametrically opposed to the opinions of this court in the two cases to which reference has already been made. These propositions, as it seems-to me, are not refuted in the opinion just pronounced, even if they are not impliedly admitted; but the suggestion is that the District Court, in the decree of the eighteenth of October, 1858, decided that the grant was one with specific boundaries, and proceeded to 'fix them in the decree, and that the decree then entered is in full force and unreversed, and that inasmuch as the appeal taken by the United States was dismissed and no new appeal was taken, the decree is binding on this court, although it was contrary to the mandate of this-cOurt given in the same caus,~. Considering the peculiar nature of the jurisdiction in •'his class of cases, I cannot admit that doctrine. Proceedings in this class of cases áre very different from the proceedings in suits at common law. Where the grant is of a tract by specific boundaries,, there would be some-force in the argument, because in *729 that class of cases it is incumbent upon, the court not only to determine -the question of confirmation, but also, if \t be decided to confirm the claim, to determine the boundaries of. the grant as a part of the original adjudication.
VIII. Such, however, is not the rule, and never was wheré the claim is wliat is called a floating claim, or where thé grant is one by quantity, to he located within certain out-boundaries, embracing a larger tract than the grant. All the courts haye to do in such eases is to decide the question of confirmation, and leave- the location to the Executive department of the G-overnment. Attention, however, is called to the act of the fourteenth of Juno, 1860; hut the answer to that reference is, that the provisions of that act have, nothing to do with the decree of the District Court, entered on the eighteenth of October, 1858, nearly two years before the act was passed. Opinion of the court undertakes to vindicate the directions given in the cause, not upon the ground that the provisions of that act apply in the case, hut upon the ground that the prior decree of the District Court had the effect to determine the controversy, and really that no further survey and location are necessary. Questions of this magnitude cannot be evaded, and ought not to be under any circumstances. Having given the subject all the consideration in my power, I am of the opinion that all that part of the decree of the District Gourt, rendered on the eighteenth of October, 1858, which attempts ■ and professes to fix the boundaries of the claim in this case, was coram non judice, and utterly void. Reluctant as I am-to differ from the majority of the court on this occasion, still I have much satisfaction in reaching that conclusion; because, if twenty- millions of property must pass from the United States to those who have no pretence of title tó it, I am not willing to cast the blame of such a monstrous result upon the office of the-Attorney-General, or to place my-decision in such a cause upon a mere technicality. Patient and .thorough investigation has convinced me that the title to the quicksilver mine is in the’United States, and it shall never pass into other hands by my vote while that convic *730 tion remains, although. I may stand alone. If this great wrong must be done, I would that it could have been done upon some other'ground; for it seems that, in the opinion of the court, the case has been pending six years since it was finally and conclusively decided, which is an anomaly, perhaps, never before witnessed in a judicial tribunal. In my view of the case, the decree of. the court should be reversed, and the cause remanded, with directions to order a new survey under the rules and regulations of the Executive department of the Government.

 United States v. Heirs of Berreyesa, 23 Howard, 499.

 United States v. Fossat, 20 Howard, 427.